**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STEVE DARNE and ROADSAFE | ) | |
| TRAFFIC SYSTEMS, INC., | ) | |
| On behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | No. 13 C 03594 |
| Plaintiff, | ) | |
| | ) | Judge John J. Tharp, Jr. |
| v. | ) | |
| | ) | |
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The plaintiffs, RoadSafe Traffic Systems, Inc. ("RoadSafe") and Steve Darne, bring this five-count Amended Complaint on behalf of a nationwide class and an Illinois class of purchasers of defendant Ford Motor Company ("Ford") "vehicles with the 6.4L Engine [ ] that required one or more repairs covered by Ford's New Vehicle Limited Warranty during the vehicle's first five years in service or 100,000 miles, whichever came first, to: a fuel injector, the EGR coolers, the oil cooler, and/or the radiator." Am. Compl. ¶¶ 33-34, Dkt. 36. The plaintiffs allege (I) breach of express warranty; (II) breach of implied warranty of merchantability; (III) breach of the Consumer Fraud Acts of Illinois and North Carolina; (IV) violation of the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"); and (V) unconscionability and unenforceability of the express warranty. This Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000 and some members of the class, including Darne, are citizens of states other than the states in which Ford is incorporated and has its principal places of business. Ford moves to dismiss all counts. For the following reasons, the motion to dismiss is granted.

# BACKGROUND[1]

Ford manufactured and sold medium and heavy-duty pickup trucks which utilized the 6.4-liter Super Duty diesel engine ("6.4L engine"). Am. Compl. ¶ 10. With these trucks, Ford issued a transferrable manufacturer's New Vehicle Limited Warranty (the "warranty") that Ford would, "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period," which was the first to occur of five years or 100,000 miles for the powertrain, including the engine, "due to manufacturing defect in factory-supplied materials or factory workmanship." *Id*. ¶ 23; *see also* Mem. in Supp. Ex. A, Warranty at 7, 11, Dkt. 42.[2] Purchasers who desire warranty coverage beyond the five-year or 100,000-mile period may extend these durational limits by purchasing an extended service plan. Warranty at 34. The warranty contains a choice-of-law provision, stating that the law of the state in which the litigant purchased the Ford vehicle governs all questions of the enforceability and interpretation of the warranty. *Id*. at 7. The warranty does not promise that each vehicle is free of defects; rather, the warranty promises to remedy, free of charge, any defects arising during the warranty period. *Id*. at 3, 9. The warranty states, in part: "The remedy under this written warranty, and any implied warranty, is limited to repair, replacement, or adjustment of defective parts. This exclusive remedy shall not be deemed to have failed its essential purpose so long as Ford . . . is willing and able to repair, replace, or adjust defective

---

[1] For purposes of this motion, the Court takes the following facts alleged by the plaintiffs in their Amended Complaint as true. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

[2] Although the plaintiffs did not attach the warranty to the Amended Complaint, the terms of this warranty are central to their claims, and Ford attached the warranty to its motion to dismiss, so the Court will consider the warranty as part of the pleadings. *See Wright v. Associated Ins. Co.*, 29 F.3d 1244, 1248 (7th Cir. 1994) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.").

parts . . . ." *Id*. at 9. Ford drafted the warranty, without any negotiation or input by the plaintiffs. Am. Compl. ¶ 90.

Plaintiff Darne is a resident of North Carolina. *Id*. ¶ 1. On May 14, 2009, Darne purchased a 2008 F-450 Duty XLT truck with a 6.4L engine from Finish Line Ford in Statesville, North Carolina and, at all times, used his truck in North Carolina. *Id*. ¶ 14. Since purchasing his truck, Darne has experienced a number of problems, including seeing white smoke emanating from the engine, repeated radiator failures that required replacement, failure of two exhaust gas temperature sensors, a broken camshaft, a broken lift, and a total failure and loss of power that required towing on four occasions. *Id*. ¶ 15.

As a result of the truck's problems, Darne has had it repaired on numerous occasions at Ford dealerships: (1) In August 2009 (when the truck had been driven 18,976 miles), Darne complained that the cooling fan turned off, the engine was overheating, and the defroster was not producing hot air, so Finish Line Ford replaced the radiator; (2) In March 2010 (when the truck had been driven 59,978 miles), Mooresville Ford replaced the gas temperature sensor twice and replaced the diesel particulate filter after the check engine light appeared and the truck failed to restart; and (3) On April 15, 2011 (when the truck had been driven 125,148 miles and, thus, was outside the warranty period), Darne had the truck towed to a Ford dealer due to issues of "running rough and cylinders 'missing'" caused by premature wearing of the camshaft and valve lifters. *Id*. ¶ 16. Because the truck was outside the warranty period on April 15, 2011, Darne paid $440 for troubleshooting of the engine, which revealed that the compression on cylinder eight was down seven percent. *Id*. ¶ 16. On April 20, 2011, Darne exchanged emails with the Ford Customer Relationship Center in which Darne was told that, because of the mileage on the Truck, there would be "no financial assistance for his concern" and that he would have to pay for

any repairs necessary to correct any defective part on the 6.4L Navistar engine. *Id*. ¶ 17. Each of the problems with Darne's truck resulted from the 6.4L engine's common root cause defects in the defective oil cooling system, the defective EGR coolers, and the oversized radiator. *Id*. ¶ 21. Darne alleges that, at the time the defects manifested themselves in his truck, it was in substantially the same condition as it was at the time Ford placed it into the stream of commerce, it had not been improperly altered in any significant way, and Darne was operating the truck as intended and in a manner foreseeable to Ford. *Id*. ¶ 20.

Plaintiff RoadSafe is a company that maintains its principal place of business in Chicago, Illinois. *Id*. ¶ 2. RoadSafe has purchased or leased more than sixty-five vehicles containing 6.4L engines. *Id*. ¶ 22. In its response in opposition to the motion to dismiss, RoadSafe states that it purchased and used all of its trucks in Illinois. Resp. at 13, Dkt. 49; *see Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439 (7th Cir. 1994) (plaintiff may raise new factual allegations for the first time in a response brief on a 12(b)(6) motion if the new allegations are consistent with the complaint); *Holladay v. CME Grp.*, No. 11-CV-8226, 2012 WL 3096698, at *2 (N.D. Ill. July 30, 2012) ("[T]he Seventh Circuit has held that new factual allegations can be raised for the first time in a brief, if the new allegations are consistent with the complaint."). These vehicles "spent months in repair shops while repeated attempts were made to repair problems stemming from the 6.4L Engine's common root cause defects." *Id*. ¶ 22.

RoadSafe details the repair history of four of its trucks as "a sampling": RoadSafe purchased each of the four trucks (VE3508, VE3510, VE3509, and VE3518) from Courtesy Dealer Ron Tirapelli Ford in Shorewood, IL. *Id*. ¶ 22. Since being delivered (the Amended Complaint does not state the date of delivery), each of the four trucks experienced multiple problems stemming from the 6.4L engine's common root cause defects, namely insufficient

cooling resulting from defects in the engine's oil cooler, EGR coolers, and radiator. *Id*. ¶ 22. RoadSafe has incurred over $20,000 to $30,000 per each of the four trucks to pay for attempted but unsuccessful repairs and towing. *Id*. ¶ 22. The Amended Complaint does not state when any of these repairs were attempted. For VE3509, the Amended Complaint states that the engine required replacing at fewer than 100,000 miles; however, for the other three vehicles, RoadSafe does not allege that the repairs and/or replacements occurred within the warranty period. *Id*. ¶ 22. RoadSafe alleges that it properly maintained its vehicles and consistently had them serviced according to the manufacturer's scheduled routine maintenance, *id*. ¶ 13, but it does not state where it brought the vehicles to be serviced, whether to a Ford dealership or to another location.

The plaintiffs allege that Ford had actual knowledge of the defects in the vehicles Darne, RoadSafe, and the class members purchased via the claims for repair of the defective engines.[3] *Id*. ¶ 25. With respect to Darne's request for repair, Ford gave Darne a "complaint number"[4] but Ford did not take any action, stating in an e-mail that "every consideration has been given to this matter," the problems "w[ere] appropriately addressed," and "we are unable to provide you with an alternate response." *Id*. ¶ 25. Upon searching the Technical Service Bulletins ("TSB") database, the plaintiffs found at least thirty-five alerts Ford released regarding engine problems with vehicles containing 6.4L engines (although the plaintiffs do not provide the date of any of the TSB alerts). *Id*. ¶ 28. Plaintiffs contend that, unless a consumer is knowledgeable about the NHTSA database, the consumer would never see or hear of the TSBs issued to automotive dealers. *Id*. ¶ 28. Additionally, Ford issued a recall in April 2007 for F-450 Super Duty trucks

---

[3] The Amended Complaint does not state when Ford, as opposed to the dealers, obtained actual knowledge of the defects in the class members' vehicles or whether Ford acquired this knowledge within the warranty period.

[4] Again, the Amended Complaint does not state when Ford gave Darne the complaint number, but presumably this occurred when Darne contacted the Ford Customer Relationship Center in 2011, after the expiration of his warranty. *See* Am. Compl. ¶ 17.

containing the 6.4L engine due to an excessive temperature defect that resulted in lack of power or rough operation, unusual noises from the engine or exhaust, white smoke from the exhaust, and visible flames out of the tailpipe; this defect and the accompanying symptoms mirror the common root cause defects and symptoms exhibited by the plaintiffs' vehicles. *Id*. ¶ 29.

The gist of the claims asserted by the plaintiffs is that the design of the 6.4L engine is inherently defective. The plaintiffs allege that there are certain "core" defects in the 6.4L engine (specifically, in the oil cooler, EGR coolers, and radiator) that cause various parts and systems to fail and ultimately lead to engine break downs. *Id*. ¶ 30. These defects, the plaintiffs allege, "are of an inherent and permanent nature which cannot be satisfactorily corrected by repairs or replacement of parts to the engine, cooling system, and related components." *Id.* The plaintiffs state that, despite knowing that the 6.4L engine had major defects, Ford only authorized minor recalibrations, adjustments, and the replacement of isolated components, which Ford knew would not adequately repair the 6.4L engines. *Id*. ¶ 23. As a result of Ford's failure to properly repair its 6.4L engines during the warranty period, the plaintiffs' and the class members' 6.4L engines suffered fatal breakdowns after the expiration of the warranty. *Id*. ¶ 24.

In May 2013, Darne filed a class complaint against Navistar, Inc. (the engine supplier) and Ford. Dkt. 1. After the defendants filed motions to dismiss the original complaint, Darne and RoadSafe filed an Amended Complaint in November 2013, alleging five counts of breach of contract and violations of various consumer protection statutes and dismissed defendant Navistar. Dkts. 36, 39. Ford then filed the instant motion to dismiss all of Darne's, RoadSafe's, and the class's claims. Dkt. 41.

## DISCUSSION

Federal pleading standards apply to state law claims in federal court. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.,* 536 F.3d 663, 671-72 (7th Cir. 2008). "To survive a motion to dismiss under Rule 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Adams*, 742 F.3d at 728 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although notice pleading under Rule 8 is a more permissible standard than the code pleading that preceded it, "it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79. A court must accept all of the plaintiff's factual allegations as true when reviewing the complaint, but conclusory allegations merely restating the elements of a cause of action do not receive this presumption: "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679; *see also Twombly*, 550 U.S. at 555 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions"). "A complaint must allege facts to support a cause of action's basic elements; the plaintiff is required to do at least that much." *Adams*, 742 F.3d at 728 (emphasis added); *see also id*. at 729 ("*Twombly* and *Iqbal* obviously require more than mere notice. When ruling on a motion to dismiss, the court must review the complaint to determine whether it contains 'enough fact to

raise a reasonable expectation that discovery will reveal evidence' to support liability for the wrongdoing alleged.").

## I.     Agreed Dismissal of Count II and part of Count IV

In their response in opposition to the motion to dismiss, Darne and RoadSafe concede that they have not and cannot allege privity of contract with Ford as required to state a claim for breach of an implied warranty of merchantability. Resp. at 1 n.1, Dkt. 49. Thus, Count II is dismissed with prejudice.

Additionally, Darne concedes that he does not have standing to assert a claim under the IUDTPA. *Id*. Accordingly, Darne's IUDTPA claim is dismissed with prejudice.

## II.    Count I: Breach of Express Warranty

A federal court sitting in diversity jurisdiction applies the choice-of-law principles of the forum state, which, for contract disputes in Illinois, generally requires application of the law of the state with the most significant contacts. *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). The warranty at issue here, however, contains a choice-of-law provision; thus, the Court looks to how Illinois courts handle choice-of-law provisions in express warranties. Illinois courts enforce an express contractual choice-of-law provision provided that "(1) it does not contravene a fundamental public policy of Illinois, and (2) the state chosen bears a reasonable relationship to the parties or the transaction." *Amakua Dev. LLC v. Warner*, 411 F. Supp. 2d 941, 948 (N.D. Ill. 2006) (citing *Potomac Leasing Co. v. Chuck's Pub Inc.*, 509 N.E.2d 751, 753-54 (Ill. App. Ct. 1987)). When the parties do not dispute the validity of the choice-of-law provision, however, the Court need not conduct that analysis and will simply give effect to the provision. *See Facility Wizard Software, Inc. v. Se. Tech. Servs., LLC*, 647 F. Supp. 2d 938, 943 (N.D. Ill. 2009); *see generally Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir. 1998)

("[I]t is the exceptional circumstance that a federal court, or any court for that matter, will not honor a choice of law stipulation."). Here, the parties do not dispute the validity of the choice-of-law provision in the warranty; therefore, the Court gives effect to that provision.

The choice-of-law provision in the warranty dictates that the law of the state in which the litigant purchased the Ford vehicle governs all questions of enforceability and interpretation. Warranty at 7. In Darne's case, Darne purchased his 2008 F-450 Super Duty XLT truck in Statesville, North Carolina. Thus, North Carolina law governs Darne's breach of express warranty claim. *See DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329-30 (7th Cir. 1987) (applying Michigan law to a suit brought in Illinois because Illinois choice-of-law principles honor contractual choice-of-law clauses). RoadSafe purchased its vehicles in Illinois, so Illinois law governs its claims.

### A.    RoadSafe's Breach of Warranty Claim Under Illinois Law

Under Illinois law, the Illinois Uniform Commercial Code, 810 ILCS 5/1-101, governs claims for breach of a limited warranty. *See Pearson v. DaimlerChrysler Corp.*, 813 N.E.2d 230, 235 (Ill. App. Ct. 2004). To state a claim for breach of an express warranty, the complaint must allege (1) the terms of the warranty; (2) a breach or failure of the warranty; (3) a demand upon the defendant to perform under the terms of the warranty; (4) a failure by the defendant to do so; (5) compliance with the terms of the warranty by the plaintiff; and (6) damages measured by the terms of the warranty. *See Ibarrola v. Kind LLC*, No. 13 C 50377, 2015 WL 1188498, at *5 (N.D. Ill. March 12, 2015) (citing *Hasek v. DaimlerChrysler Corp.*, 745 N.E.2d 627, 638 (Ill. App. Ct. 2001)). The language of an express warranty dictates the rights and obligations of both the manufacturer and consumer; therefore, under Illinois law, "express warranties of limited duration cover only defects that become apparent during the warranty period." *Evitts v.*

*DaimlerChrysler Motors Corp.*, 834 N.E.2d 942, 950 (Ill. App. Ct. 2005); *see also Mydlach v. DaimlerChrysler Corp.*, 875 N.E.2d 1047, 1060-61 (Ill. 2007) ("Because the promise to repair or replace defective parts is only good during the warranty period, the latest a breach of warranty can occur is at the very end of that period."). Thus, a plausible claim for breach of an express limited warranty arises only if the manufacturer failed to remedy a problem appearing within the warranty period.

Ford argues that RoadSafe failed to allege that the myriad problems the plaintiffs allege to have experienced with the 6.4L engines in its vehicles became apparent during the warranty period. This is not, as the plaintiffs maintain, a failure to plead factual details that is unnecessary to provide adequate notice of the claim; this is a wholesale omission to plead any facts that, taken as true, would establish the cause of action's basic elements; again, "the plaintiff is required to do at least that much." *Adams*, 742 F.3d at 728.[5] To plausibly allege that a problem became apparent during the warranty period, RoadSafe must at least state the date of purchase and the date that the problem appeared, or the number of miles driven when the problem appeared. *See* Warranty at 8 (coverage for the 6.4L engine lasts for five years or until the vehicle has been driven 100,000 miles, whichever occurs first). That should present a minimal pleading burden if, in fact, problems appeared and repairs were attempted during the warranty period, but RoadSafe's Amended Complaint provides virtually no allegations that would support a plausible inference that the problems appeared during the warranty period. To begin, RoadSafe identifies

---

[5] *Adams* directly contradicts the plaintiffs' assertion that "general allegations of [the] existence of contract, breach, and damages are sufficient" to state a claim for breach of express warranty under Seventh Circuit law. Resp. at 4. That proposition cannot be reconciled with the Supreme Court's teaching that "[t]hreadbare recitals of the elements of a cause of action . . . do not suffice." *Iqbal,* 556 U.S. at 678. That explains why the plaintiffs cite only a pre-*Twombly* district court case to support their contention. Resp. at 4 (citing *Quantum Color Graphics, LLC v. Fan Ass'n Event Photo GmbH,* 185 F. Supp. 2d 897, 905-06 (N.D. Ill. *2002*).

only four of the sixty-five vehicles it purchased; that might be enough to make the claim plausible had RoadSafe provided any information about the problems that allegedly afflicted those exemplars, but even for those four vehicles, RoadSafe only alleges once, with respect to VE3509, that a repair was needed within 100,000 miles of service. Am. Compl. ¶ 22 ("Eventually, the entire engine had to be replaced (at less than 100,000 miles)."). An allegation that one truck out of 64 needed an engine replacement during the warranty period does not create a plausible inference that there were continuous problems afflicting the fleet. Moreover, the Amended Complaint alleges that RoadSafe paid to repair these unspecified problems, and that allegation indicates that the repairs in question occurred outside of the warranty period.[6] By failing to allege facts regarding Ford's failure to repair problems appearing within the warranty period for all but one of its vehicles, RoadSafe has failed state a claim for breach of express warranty for which it is entitled to relief. *Federico v. Freedomroads RV, Inc.*, No. 09-CV-2027, 2010 WL 4740181, at *5-6 (N.D. Ill. Nov. 10, 2010) (dismissing breach of express warranty claim for failing to allege facts showing that warranty covered alleged defects).

Moreover, RoadSafe has not alleged how Ford failed to fulfill the terms of the warranty: although RoadSafe has alleged problems with its vehicles' engines, it has not alleged specific instances in which the problems were brought to a Ford dealer and the Ford dealer failed to remedy them. Mem. in Supp. at 6. For the four sample vehicles RoadSafe describes, it notes that each "experienced multiple problems stemming from the 6.4L Engine's common root cause defects," but does not include any information about when or where it took the vehicles to be repaired and what specific repairs were attempted and failed. Am. Compl. ¶ 22. In failing to

---

[6] Because RoadSafe has incurred between $20,000-$30,000 in repair and towing costs per each of the four vehicles it described, presumably those repairs were made outside of the warranty period. *See* Am. Compl. ¶ 22; Warranty at 3 ("You will not be charged for repairs covered by any applicable warranty during the stated coverage periods.").

include any information regarding whether it took its vehicles to a Ford dealer for repairs, what type of repairs were needed, and whether those repairs were successful, RoadSafe failed to plead any facts supporting the plausibility of its claim for breach of express warranty. *Cf. Federico*, 2010 WL 4740181, at *6 ("[T]he breach of express warranty claim in Federico's Complaint still fails to identify the portion of the Winnebago Warranty that applies to the RV's alleged defects.").

As it presently stands, RoadSafe's allegation allows no inference that Ford failed to repair engine problems that arose during the warranty period. It is possible that's what happened, but "the plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Iqbal,* 556 U.S. at 678-79 (internal quotation marks and punctuation omitted). And although the Court will extend a further opportunity to the plaintiffs to cure these deficiencies, it is worth noting that the plaintiffs' failure to plead the requisite facts about the appearance and repair of engine problems during the warranty period may be due to the fact that their theory isn't really that Ford didn't repair the part that had malfunctioned but rather that the 6.4L engine was inherently defective. Indeed, the Amended Complaint expressly alleges that the engine's defects ***can't be repaired***: "The defects are of an inherent and permanent nature which cannot be satisfactorily corrected by repairs or replacement of parts to the engine, cooling system, and related components." Am. Compl. ¶ 30. But the warranty plainly doesn't guarantee an engine that is free of defects; as noted, it acknowledges that the 6.4L engine may have defects. *See* Warranty at 9. That is the reason for a warranty: to repair any problem that such defects might cause during the warranty period. It is a fair reading of what the Amended Complaint

alleges, and what it does not allege, that the plaintiffs contend that the warranty entitled them to a defect-free engine that would last half a million miles. *See* Am. Compl. ¶ 11 ("The Ford F450 Super Duty is expected to perform up to 500,000 miles."). But pleading problems that occurred beyond the limited warranty that Ford actually issued—five years or 100,000 miles—rather than facts establishing that Ford failed to address problems that arose within the warranty period, will not make the plaintiffs' breach of warranty claim more plausible.

Because RoadSafe has failed to plead facts that state a claim for breach of express warranty, the Court grants Ford's motion to dismiss Count I without prejudice as to RoadSafe.

**B.      Darne's Breach of Warranty Claim Under North Carolina Law**

Darne's breach of warranty claim fails for the same reasons. The analysis of a breach of warranty claim under North Carolina law is substantially the same as under Illinois law: to recover for breach of express warranty under North Carolina law, a consumer must allege that (1) a defect exists, (2) a warranty covered the defect, and (3) the seller breached the warranty. *Butcher v. DaimlerChrysler Co., LLC*, No. 1:08CV207, 2008 WL 2953472, at *2 (M.D.N.C. July 29, 2008) (citing N.C. Gen. Stat. § 25-2-313).

Ford argues that Darne did not allege that Ford ever failed to repair Darne's truck pursuant to the warranty. Ford points out that a Ford dealer repaired Darne's vehicle twice and did not charge him for these repairs, pursuant to the warranty: Ford repaired Darne's vehicle once at 18,976 miles, after which Darne drove the vehicle for 40,000 miles before seeking another repair at 59,978 miles. Reply at 2. After the second repair, Darne drove the vehicle an additional 65,000 miles without seeking another repair, which took Darne's vehicle well beyond the warranty's mileage limitation. Although Darne has at least identified two repairs that were needed during the warranty period, he has failed to allege that Ford did not repair his truck

pursuant to the warranty. As in *Arndt v. Extreme Motorcycles*, where the manufacturer made all of the repairs necessary to solve problems brought to its attention, Ford repaired both specific problems that Darne's truck experienced (first replacing the radiator and next replacing the gas temperature sensor and diesel particulate filter) that became apparent during the warranty period. 2007 WL 4570861, at *5 (W.D.N.C. Dec. 26, 2007) (plaintiffs could not prevail on a breach of limited warranty claim because the defendant repaired any problems that were called to its attention and, thus, fully complied with the terms of the written limited express warranty). The problem that surfaced at 125,000 miles—running rough and cylinders missing caused by premature wearing of the camshaft and valve lifters—was not brought to Ford's attention during the warranty period and thus, Ford cannot be said to have failed to address the problem as required under the warranty. Am. Compl. ¶ 16.

Darne next claims that Ford repeatedly made inadequate repairs, resulting in the deterioration of his truck "to the point that it could no longer be driven." *Id.* ¶ 19. Under North Carolina law, purchasers of vehicles are entitled to repairs in a reasonable number of attempts. *See Taylor v. Volvo N. Am. Corp.*, 451 S.E.2d 618, 621 (N.C. 1994); N.C. Gen. Stat. § 20-351.3(a) (if the manufacturer cannot repair a defect after a reasonable number of attempts, the consumer is entitled to a replacement vehicle or a refund). Taking a vehicle in for repair for the same problem four or more times within the warranty period constitutes a reasonable number of attempts under North Carolina law. *See Hardison v. Kia Motors Am., Inc.*, 738 S.E.2d 814, 816 (N.C. Ct. App. 2013) (citing N.C. Gen. Stat. § 20-351.5(a)(1)).

Here, Darne does not allege sufficient facts to plausibly suggest that Ford failed to repair his truck within a reasonable number of attempts; indeed, the facts pleaded effectively rebut that contention. As alleged in the Amended Complaint, Darne only brought his vehicle to a Ford

dealer three times for repair (only twice within the warranty period), and the repairs addressed different issues (first for a radiator replacement, second for a new exhaust gas temperature sensor and diesel particulate filter, and third for premature wearing of the camshaft and valve lifters).[7] Am. Compl. ¶ 16. That his truck engine required two repairs over the course of more than 100,000 miles hardly establishes that the engine was not properly repaired and is utterly at odds with the claim that Ford's inadequate repairs rendered the truck undriveable. As to the third repair, Darne admits that this problem arose, and repair occurred, outside the warranty period. When plaintiffs allege problems that became apparent outside of the explicit warranty period, such problems cannot serve as a basis for a breach of the express warranty claim. *Arndt*, 2007 WL 4570861, at \*5 ("[P]laintiffs cannot herein allege any damages inasmuch as the motorcycle has been repaired each time it was presented to the dealer with a problem [within the warranty period.]"); *see also Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) (a plaintiff can plead himself out of court by pleading facts that show he has no legal claim).

Even taking all well-pleaded facts as true, the Court cannot plausibly infer that Ford breached its express warranty in regard to Darne's vehicle: Ford repaired free of charge the malfunctioning parts that manifested within the warranty period, permitting Darne's vehicle to operate problem-free for the next 40,000 miles and then 65,000 miles. Thus, Darne has not stated a claim for breach of express warranty that is plausible on its face.[8] The Court will similarly extend leave to replead to Darne, but cautions again that the 6.4L engine warranty did not

---

[7] Darne refers to all of these problems as "problems related to common root cause defects in the 6.4L Engine's EGR coolers, oil cooler, and radiator." Am. Compl. ¶ 16. Each repair however, was for a different part of the engine, and as the warranty explains, it entitles a purchaser to the repair or replacement of "all parts" that malfunction during the warranty period, not to an entire engine replacement each time a part of the engine malfunctioned. Warranty at 9; *see* Mem. in Supp. at 5-6.

[8] Because the Court finds these arguments sufficient to dismiss Darne's claim for breach of express warranty, the Court does not address Ford's remaining arguments.

promise an engine free of defects, but rather to repair the engine when problems arose because of defects. Unless he left out of the Amended Complaint problems that he presented to Ford during the warranty period and that Ford failed to repair, Darne's claim for breach of warranty will not succeed.

### III.  Count V: Unconscionability of the Express Warranty

Darne and RoadSafe seek a declaration that the durational limits in the express warranty are unconscionable and, therefore, unenforceable. Am Compl. ¶ 26. Whether a contract is unconscionable is a question of law to be decided by the court. *See Tillman v. Commercial Credit Loans, Inc.*, 655 S.E.2d 362, 369 (N.C. 2008); *Razor v. Hyundai Motor Am.,* 854 N.E.2d 607, 622 (Ill. 2006).[9] A contract may be either procedurally or substantively unconscionable. Procedural unconscionability refers to both a situation where a term is so difficult for a plaintiff to find or understand that he cannot have been aware he was agreeing to it and also to a plaintiff's lack of bargaining power or lack of meaningful choice. *See Tillman*, 655 S.E.2d at 370; *Razor*, 854 N.E.2d at 622. Substantive unconscionability refers to contract terms which are "inordinately one-sided in one party's favor." *Razor*, 854 N.E.2d at 622; *accord Tillman*, 655 S.E.2d at 370. In Illinois, a court can invalidate a contract if it is either procedurally or substantively unconscionable. *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 890 F. Supp. 2d 912, 943 (N.D. Ill. 2012). In North Carolina, however, a plaintiff must prove *both* procedural and substantive unconscionability. *Wilkerson ex rel. Estate of Wilkerson v. Nelson*, 395 F. Supp. 2d

---

[9] The plaintiffs argue that it is premature to decide the unconscionability question on a motion to dismiss. *Id*. at 13-14. They cite *Federico* for this proposition (although, as noted, they ignore what it says about pleading standards), Resp. at 13-14, but their reliance here is misplaced, because in *Federico* the district court did consider the adequacy of the allegations of unconscionability, finding them adequate though far from compelling. *Id*. at *8.; *see also Stavropoulos v. Hewlett-Packard Co.*, No. 13 C 5084, 2014 WL 2609431, at *3 (N.D. Ill. June 9, 2014) (denying motion to dismiss unconscionability claim because the plaintiff "has passed the pleadings threshold for unconscionability").

281, 289 (M.D.N.C. 2005). Additionally, Illinois and North Carolina both enforce durational limits in express warranties. *See, e.g.*, *Evitts*, 834 N.E. 2d at 949 (three-year/36,000-mile vehicle warranty not unconscionable); *Moore v. Coachmen Indus., Inc.*, 499 S.E.2d 772, 778 (N.C. Ct. App. 1998) (one-year/15,000 mile recreational vehicle warranty not unconscionable).

The plaintiffs focus on procedural unconscionability, arguing that, "to avoid responsibility for these defects, [Ford] used its bargaining power to require buyers to accept a warranty with a shorter period." Resp. at 14-15. Again, however, they failed to allege facts sufficient to plausibly support the theory that Ford used its bargaining power to force buyers like Darne and RoadSafe to accept a shorter warranty period (nor do they define "shorter period"— Shorter than the plaintiffs would have liked? Shorter than other comparable warranties?). The Amended Complaint sets forth no information as to when Darne and RoadSafe became aware of the warranty or whether it induced their purchases or whether they learned about the warranty's duration after completing their purchases. *Cf. Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, 936 F. Supp. 2d 933, 943 (N.D. Ill. 2013) ("[Defendant's] concealment [of the inoperability of the trucks] did not have the effect of limiting [the plaintiff's] ability to understand the terms of the contract or [the plaintiff's] ability to bargain for different terms, nor did [the defendant's] concealment deprive [the plaintiff] of a meaningful choice related to the bargaining process."); *see also Westmoreland v. High Point Healthcare Inc.*, 721 S.E.2d 712, 717 (N.C. Ct. App. 2012) ("[B]argaining inequality alone generally cannot establish procedural unconscionability. Otherwise, procedural unconscionability would exist in most contracts between corporations and consumers.").

Moreover, although Ford acknowledges that it unilaterally drafted the terms of the warranty, it highlights that all purchasers had the opportunity to purchase additional warranty

coverage for repairs beyond the expiration of the original warranty, and that this opportunity provided consumers with a "'meaningful choice' that defeats a finding of procedural unconscionability." Mem. in Supp. at 16. The Court agrees. If the plaintiffs wanted additional coverage beyond the "shorter period" of the warranty, they had the option to purchase an extended warranty; this provided the meaningful choice that is unavailable in a procedurally unconscionable contract. *See Smith v. Ford Motor Co.*, 462 F. App'x 660, 663-64 (9th Cir. 2011) (no procedural unconscionability where plaintiff "was presented with a meaningful choice, not just the option of purchasing a different vehicle from a different manufacturer, but also the option of purchasing a different warranty with an extended durational limit from Ford"); *see also O'Quinn v. Comcast Corp.*, No. 10 C 2491, 2010 WL 4932665, at *5 (N.D. Ill. Nov. 29, 2010) (that plaintiff had a choice whether to accept arbitration agreement "weighs heavily against a finding of procedural unconscionability").

As to substantive unconscionability, the Amended Complaint does not include any facts supporting that the warranty is "inordinately one-sided in [Ford's] favor." *Razor*, 854 N.E.2d at 622. Ford provided a five-year, 100,000-mile engine warranty to all purchasers, free of additional charge. There are no factual allegations that the time period or mile duration was unreasonably short, other than the plaintiffs' conclusory assertion the Ford knew "that the 6.4L Engine was defective and would fail repeatedly beyond the warranty repair period." Am. Compl. ¶ 91; *see McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) ("[W]e accept the well-pleaded facts in the complaint as true, but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth."). In fact, Ford expressly acknowledged that parts of its vehicle ***might be defective*** and that was the reason it provided the five-year, 100,000-mile warranty: "in order to remedy any such defects that result

in vehicle part malfunction or failure during the warranty period." Warranty at 9 ("This warranty does not mean that each Ford vehicle is defect free. Defects may be unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs."). Moreover, the plaintiffs did not respond to Ford's substantive unconscionability argument and, as such, have waived the argument. *See* Resp. at 13-15; *Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument—as the [plaintiff has] done here—results in waiver.").

Because the plaintiffs made no argument as to substantive unconscionability and North Carolina requires a finding of both substantive and procedural unconscionability, Darne's claim of unconscionability fails under North Carolina law. Furthermore, the warranty is not procedurally unconscionable under Illinois law because the plaintiffs had the opportunity to extend their warranty coverage beyond the term in the unilaterally drafted limited warranty, so the unconscionability argument fails under Illinois law as well. The motion to dismiss Count V is granted without prejudice.

## IV.    Counts III and IV: The Statutory Claims

The plaintiffs claim that Ford violated a number of state consumer protection statutes because Ford failed to inform consumers that the 6.4L engine was defective and affirmatively misrepresented that the repairs made to the engine during the warranty period would adequately address the problems. RoadSafe alleges that Ford's omissions and misrepresentations violated statutory consumer fraud acts in both Illinois (the Illinois Consumer Fraud and Deceptive Business Practices Act, or "ICFA," 815 ILCS 505/ 1 et seq., and the IUDTPA) and North Carolina (the North Carolina Uniform Deceptive Trade Practices Act, or "NCUDTPA," N.C. Gen. Stat. § 75–1.1).

### A.     Illinois Consumer Fraud Act

RoadSafe alleges that Ford misled consumers by failing to disclose the "defects inherent to [sic] the 6.4L engine and failing to properly repair the defective engines." Am. Compl. ¶ 71. An ICFA claim requires "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer*, 922 N.E.2d 309, 313 (Ill. 2009). To prove that the defendant's deceptive act was the proximate cause of the plaintiff's damages, the ICFA requires proof of actual deception by the defendant's statement or material omission. *See id*. at 316.

An "omission" under the ICFA is an omission from a communication, not a general failure to disclose, as the plaintiffs maintain. The plaintiffs cite *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584 (Ill. 1996), Resp. at 7, but in the later-decided *De Bouse*, the Illinois Supreme Court held that "to maintain an action under the Act, the plaintiff must actually be deceived by a statement or omission that is made by the defendant," and "[i]f there has been no communication with the plaintiff, there have been no statements and no omissions. . . . A consumer cannot maintain an action under the Illinois Consumer Fraud Act when the plaintiff does not receive, directly or indirectly, communication or advertising from the defendant." *De Bouse*, 922 N.E.2d at 316; *see also Ciszewski v. Denny's Corp.*, No. 09C5355, 2010 WL 1418582, at *3 (N.D. Ill. Apr. 7, 2010) (dismissing ICFA claim where plaintiff failed to identify a communication he received from defendant with the allegedly deceptive omission). In so holding, the state Supreme Court rejected the plaintiff's reliance on *Connick*, on which RoadSafe also relies, because in *Connick* there were allegedly deceptive communications from the defendants to the plaintiffs, namely advertising. To the extent that language in *Connick* can be read to suggest that a general

failure to disclose is a sufficient omission, that dicta does not reflect the prevailing view of the Illinois Supreme Court and is no longer consistent with the state's treatment of claims under the ICFA.

RoadSafe has failed to identify any communication with Ford in which Ford omitted to disclose the defective engine. RoadSafe asserts that the express warranty misrepresented that the repairs or replacements offered during the warranty period would adequately correct any defects. Ford argues that RoadSafe failed to identify any misrepresentation or omission that Ford made that *actually deceived* RoadSafe and upon which it relied in purchasing its vehicles. As noted *supra* at 17, RoadSafe did not state when it reviewed the warranty or whether the warranty's provision of free repairs to defective parts induced its purchases. Without that information, RoadSafe has failed to plausibly show that it had seen any alleged misstatement, was actually deceived by the statement, and relied on the statement in purchasing the vehicles. *See De Bouse*, 922 N.E.2d at 316 ("If a consumer has neither seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause.").

Moreover, RoadSafe's assertion that Ford omitted to inform consumers of the defective engine, despite Ford's knowledge of the engine problems, is factually lacking. To support its assertion that Ford "knew . . . that the 6.4L Engine was defective and would fail repeatedly beyond the warranty repair period," RoadSafe cites to the TSB alerts and the 2007 recall of another Ford truck with the same 6.4L engine and similar defects as those RoadSafe experienced. Although RoadSafe fails to include the dates of any of the TSB alerts, the Court may take judicial notice of the publicly available alerts,[10] which appear to have first issued with respect to

---

[10] The Amended Complaint acknowledges that the TSBs are publicly available and searchable. Am. Compl. ¶ 28 (reporting results of a search of the NHTSA database of TSBs). Further, the Court can take judicial notice of the availability of public documents on the internet.

the engine in March 2008. *See Service Bulletins-Search Results, Ford 2008 F Super Duty*, NHTSA, available at https://www-odi.nhtsa.dot.gov/cars/problems/tsb/results.cfm (last visited Dec. 18, 2015). Because RoadSafe failed to state when it purchased any of its vehicles, however, it is impossible to discern whether the 2007 recall or any of the TSB alerts (and Ford's knowledge of any problems with the 6.4L engine) occurred before RoadSafe purchased its vehicles.

In light of the absence of allegations identifying any allegedly fraudulent communication or omission, the Amended Complaint fails to plausibly establish a claim for fraud, but even if the complaint satisfied Rule 8's plausibility standard, it plainly falls well short of the heightened pleading standard required for fraud claims under Rule 9(b). Rule 9(b) creates an exception to the federal regime of notice pleading, specifying that, in "alleging fraud or mistake, a party must state **with particularity** the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). An ICFA claim that sounds in fraud must satisfy the heightened pleading standard under 9(b): "In adding flesh to the bones of the word particularity, we have often incanted that a plaintiff ordinarily must describe the 'who, what, when, where, and how' of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011). RoadSafe falls short of this standard in nearly every respect.

As noted, RoadSafe has not identified any communication containing a misrepresentation or omission; the only communication identified is the warranty, which expressly discloses that the engine may contain defects. *See* Warranty at 9. Nor has RoadSafe included any dates when

---

*Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008) ("We may take judicial notice of documents in the public record . . . without converting a motion to dismiss into a motion for summary judgment."); *United States ex rel. Dingle v. Bioport Corp.*, 270 F. Supp. 2d 968, 973 (W.D. Mich. 2003) (court may take judicial notice of "public records and government documents available from reliable sources on the Internet").

the alleged fraud occurred. While the Amended Complaint contends that "Ford misrepresented (either through affirmative statements or omissions) that the repairs during the warranty period would remedy any problems with the 6.4L Engine," it does not include any details as to when, where, or how Ford misrepresented this information. Am. Compl. ¶ 23. As also noted previously, the Amended Complaint does not establish that the repairs during the warranty period failed to remedy problems with the engine; indeed, RoadSafe only noted one instance where one of its sixty-five vehicles had any repairs within the warranty period. *Id.* ¶ 22(c). By failing to provide any additional information as to the timing or type of repairs, RoadSafe has not pleaded any facts supporting its assertion that Ford failed to repair the engines during the warranty period. Although RoadSafe enumerates a number of alleged defects with the 6.4L engine, *see* Resp. at 9 n.2, identifying alleged defects is not sufficient, alone, to plead fraud with particularity as required under Rule 9(b).

Because RoadSafe failed to plead with particularity that it relied on any misrepresentations or omissions by Ford and was damaged by such reliance, the motion to dismiss Count III as to RoadSafe is granted without prejudice.[11]

## C.    North Carolina Deceptive Trade Practices Act

Darne's consumer fraud claim fails for the same reasons. To establish a claim for unfair trade practices in North Carolina, "a plaintiff must show: (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Bumpers v. Cmty. Bank of N. Virginia*, 747 S.E.2d 220, 226 (N.C. 2013). Like the ICFA, a claim of misrepresentation under the NCUDTPA

_____

[11] Because the plaintiffs have failed to adequately plead fraud, the only exception to the economic loss rule on which they rely, that rule also bars their claims under both Illinois and North Carolina law.

requires a plaintiff "to demonstrate reliance on the misrepresentation in order to show the necessary proximate cause." *Id.*

Like RoadSafe, Darne alleges that Ford concealed a material fact by failing to disclose the alleged inherent design problems with the 6.4L engine. Resp. at 6-7. Concealment of a material fact can form the basis of a NCUDTPA claim where a party has a legal duty to communicate, which may arise "where 'a party has taken affirmative steps to conceal material facts from the other'" or "'where one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence.'" *F.D.I.C. v. Mingo Tribal Pres. Trust*, No. 5:13-CV-113, 2015 WL 1646751, at *3 (W.D.N.C. Apr. 14, 2015) (quoting *Harton v. Harton,* 344 S.E.2d 117, 119 (N.C. Ct. App. 1986)); *see also Bear Hollow, L.L.C. v. Moberk, L.L.C.,* No. 5:05CV210, 2006 WL 1642126, at *6 (W.D.N.C. June 5, 2006) ("Under North Carolina law, in order for silence or an omission by the defendants to be actionable fraud, it must relate to a material matter known by the defendants which they had a legal duty to communicate to plaintiff."). That is of no help to Darne, however, since (so far as has been alleged) he had no negotiations with Ford itself concerning his purchase of his truck.

As evidence that Ford knew of the engine problems, Darne (like RoadSafe) cites the TSB alerts and the 2007 recall of another Ford truck with the same 6.4L engine. Am. Compl. ¶¶ 28-29. This information actually undermines, rather than supports, Darne's claim, however; the TSBs and the 2007 recall are public information disclosed on a number of websites, including that of the NHTSA.[12] That Ford publicly issued a number of TSBs related to the 6.4L engine is

---

[12] As noted, the Court may take judicial notice of the TSB alerts. This does not mean that factual information in such records can necessarily be credited, but only that certain records or

incompatible with allegations that it attempted to conceal these facts. Moreover, Ford had no duty to disclose information about any alleged defects in the engine because consumers, like Darne, could have discovered that information with the exercise of reasonable diligence. Darne states that, "unless the consumer is knowledgeable about the NHTSA database," he or she never sees or hears of the TSBs Ford issued. Am. Compl. ¶ 28. Although the NCUDTPA does not require a consumer to be "knowledgeable," it does require a consumer to use reasonable diligence to investigate before imposing a duty on the seller to affirmatively disclose a defect. *See Mingo Tribal*, 2015 WL 1646751, at *3. Because Darne could have discovered information about the 6.4L engine "through reasonable diligence" but failed to make any investigation (Darne has not pled any facts regarding what, if any, investigation he did before purchasing his truck), he has failed to state a plausible claim for fraudulent concealment under the NCUDTPA. *See Slate v. Byrd*, No. 1:09CV852, 2013 WL 1103275, at *15 (M.D.N.C. Mar. 15, 2013) *report and recommendation adopted as modified*, No. 1:09CV852, 2013 WL 2474336 (M.D.N.C. June 10, 2013) ("a claim for either fraud or fraudulent concealment is not cognizable where the pleader fails to make an independent investigation").

Darne claims that Ford affirmatively misrepresented that the repairs made during the warranty would adequately address the defects. Resp. at 8. Darne's claim fails for the same reasons RoadSafe's ICFA claim fails; Darne did not state when he became aware of the warranty, and without facts asserting that Darne reviewed the warranty before purchasing his truck, he cannot establish that he "affirmatively incorporated the alleged misrepresentation [in the warranty] into his [ ] decision-making process." *Bumpers*, 747 S.E.2d at 227. Darne has,

---

information exist or are publicly available. The relevant point here is that the TSBs can be accessed through the web by consumers.

therefore, failed to plead facts necessary to establish proximate cause for this alleged misrepresentation.[13]

Therefore, Count III is dismissed as to Darne without prejudice.

### C.    Illinois Uniform Deceptive Trade Practices Act

The IUDTPA "provides injunctive relief for a plaintiff who can demonstrate that a defendant engaged in any of the 12 enumerated types of conduct" listed in 815 ILCS 510/2(a), including representing that goods or services are of a particular standard or quality or engaging in any conduct which creates a likelihood of confusion or misunderstanding. *Int'l Star Registry of Illinois v. ABC Radio Network, Inc.*, 451 F. Supp. 2d 982, 990 (N.D. Ill. 2006) (citing *Popp v. Cash Station, Inc.*, 613 N.E.2d 1150, 1156 (Ill. App. Ct. 1992)); *see* Resp. at 6. To sustain a consumer action under the IUDTPA (which is primarily directed to unfair competition between businesses rather than consumer protection), a consumer must allege "the requisite elements that would entitle it to injunctive relief, including 'facts which would indicate that [it] is likely to be damaged in the future.'" *Int'l Star Registry*, 451 F. Supp. 2d at 990-91 (brackets in original). Proving the likelihood of future harm is difficult under the IUDTPA because the harm from the allegedly deceptive practice has usually already occurred. *See id.*

As to future harm, RoadSafe argues that if they "tried to sell their trucks, they would be required to disclose the defects and steeply discount the selling price," and if RoadSafe were to

---

[13] Darne also cites to his communications with Ford, where Ford "gave him a 'complaint number' but refused to take any action, stating in an e-mail that 'every consideration has been given to this matter,' the problems 'w[ere] appropriately addressed,' and 'we are unable to provide you with an alternate response.'" Resp. at 7-8 (quoting Am. Compl. ¶ 25). Although Darne does not provide a specific date when he communicated with Ford, this communication plainly took place after Darne took his truck in for a third repair, at a point when the warranty coverage had expired. *See* Am. Compl. ¶ 17. Even if it had been made during the warranty period, this statement was certainly after Darne purchased his truck, which precludes any reliance on the statement to induce his purchase. Thus, Darne has failed to demonstrate proximate cause as to this statement.

"keep their trucks, they will be forced to undertake complex and costly repairs in the future."
Resp. at 13. Even if those future risks were sure to materialize, however, RoadSafe's claim
would fail because it "cannot allege that it will be deceived in the future, so the ILDTPA is
inappropriate to address the damages it alleges." *Aliano v. Louisville Distilling Co., LLC*, No. 15
C 00794, 2015 WL 4429202, at *4 (N.D. Ill. July 20, 2015) (citing *Popp*, 613 N.E.2d at 1156).
RoadSafe has already claimed that it has been deceived about the quality of Ford's engine; any
future monetary harm it incurs will be the product of that past deception, not some future
deception, which makes an injunction under the IUDTPA an inappropriate form of relief. *See
Aliano*, 2015 WL 4429202, at *4; *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 918 (N.D. Ill.
2013) ("Reid has already made her purchase and is aware of the alleged defect in the Hair
Treatment . . . since Reid cannot show a likelihood of future damage from Unilever's acts, her
claim under the Illinois UDTPA fails."). This is a problem that repleading cannot cure, so Ford's
motion to dismiss Count IV is granted with prejudice.

*     *     *

Darne and RoadSafe have failed to state facts that could plausibly lead to Ford's liability
under Illinois or North Carolina law for any of the five counts they allege; aside from Count II
and Count IV, which are dismissed with prejudice, the remainder of the Amended Complaint is
dismissed without prejudice. While it is true, as Ford notes, that the plaintiffs have already
amended their Complaint once in response to prior motions to dismiss, the plaintiffs have not had
the opportunity to amend the Complaint in response to a ruling by the Court as to the
deficiencies in the Complaint; in most cases, they should have that opportunity. *See Runnion ex
rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir.
2015) ("[A] plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be

given at least one opportunity to try to amend her complaint before the entire action is dismissed."); *Alioto v. Town of Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011) ("[A] motion to dismiss under Rule 12(b)(6) is not a responsive pleading and so, if an answer has not been filed, a plaintiff ordinarily retains the ability to amend his complaint once as a matter of right, even after a court grants a motion to dismiss."). Thus, to the extent that the plaintiffs can attempt, in good faith, to cure the deficiencies in the Amended Complaint, they may file a Second Amended Complaint within 30 days of this order. In the absence of a timely filed Second Amended Complaint, the case will be dismissed with prejudice.

Dated: December 18, 2015

_____
John J. Tharp, Jr.
United States District Judge