**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STEVE DARNE and | ) | |
| ROADSAFE TRAFFIC SYSTEMS, INC., | ) | |
| on behalf of themselves and | ) | |
| all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 13 CV 03594 |
| | ) | |
| FORD MOTOR COMPANY, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Following this Court's dismissal of their previous complaint, plaintiffs RoadSafe Traffic Systems, Inc. and Steve Darne lodged their Second Amended Complaint on behalf of proposed nationwide, Illinois, and North Carolina classes. The proposed classes would include people who purchased or leased defendant Ford Motor Company "vehicles with the 6.4L Engine [ ] that required one or more repairs covered by Ford's New Vehicle Limited Warranty during the vehicle's first five years in service or 100,000 miles, whichever came first, to: a fuel injector, the EGR coolers, the oil cooler, and/or the radiator." Second Am. Compl. ("SAC") ¶¶ 36-38. RoadSafe brings a claim for breach of express warranty (Count I) and a claim for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, or "ICFA," 815 ILL. COMP. STAT. 505/1 et seq., (Count II),[1] both on behalf of the proposed nationwide and Illinois classes. *Id.* ¶¶ 48-72. Darne brings a claim for violation of the North Carolina Uniform Deceptive Trade Practices Act, or "NCUDTPA," N.C. GEN. STAT. § 75–1.1 (Count III) on behalf of the proposed

---

[1] The SAC erroneously labels the ICFA claim as "Count III" and the NCUDTPA claim as "Count IV." *See* SAC at 24, 27. The Court refers to their correct Roman numerals here.

North Carolina class. *Id.* ¶¶ 73-85. This Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000[2] and some members of the class, including Darne, are citizens of states other than Delaware,[3] the state in which Ford is incorporated, and Michigan, the state in which Ford has its principal places of business. *See* SAC ¶ 3.

Ford moves to dismiss the SAC in its entirety. As discussed further below, although the SAC addresses some of the pleading deficiencies identified in the Court's prior ruling, it still suffers from the fundamental problem that the warranty at issue guarantees that Ford will repair, not prevent, problems with its 6.4L engines. The plaintiffs maintain that the engine "is expected to perform up to 500,000 miles." SAC ¶ 11. But Ford warrantied the engine for 100,000—not 500,000—miles. It did not promise that its 6.4L engines were free from defects, and did not conceal defects from the plaintiffs, so the claims asserted here fail as a matter of law.

## BACKGROUND

---

[2] RoadSafe alleges that for the four trucks for which it identifies specific instances of repair, it has incurred more than $100,000 in expenses (between $20,000 and $30,000 per truck) "to pay for attempted but unsuccessful repairs and towing," apparently including instances described in the complaint in which the vehicles were no longer under warranty. *See* SAC ¶ 25. Darne does not identify the amount of expenses he incurred in relation to his truck. The plaintiffs assert that the proposed classes "are composed of thousands of owners." *Id.* at ¶ 40. *See* 28 U.S.C.A. § 1332(d)(6) ("In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.").

[3] The complaint alleges that Darne, a member of the putative nationwide class, is a "resident" of North Carolina. ¶ 1. That is insufficient, standing alone, to allege his citizenship, *see Heinen v. Northrop Grumman Corp.*, 671 F.3d 669, 670 (7th Cir. 2012), but the complaint also alleges that Darne is not a citizen of Delaware or Michigan. ¶ 4. Considering these allegations together, the Court concludes that there is a sufficient (if barely) basis to conclude that there is diversity between Darne and Ford, and so there is diversity under CAFA, which requires only that at least one member of the class be diverse from the defendant(s). *See* 28 U.S.C. § 1332(d)(2)(A).

In deciding a motion to dismiss under Rule 12(b)(6), the Court takes as true all well-pleaded facts alleged in the complaint and draws all reasonable inferences in favor of the non-moving party. *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013). The following facts are, therefore, accepted as true for the purposes of deciding this motion. Darne and RoadSafe asserted many of these same facts in their previous complaint; because they have added a select number of additional factual allegations, and in order for this Opinion to have sufficient clarity, the Court will not abbreviate its factual summary despite the recitation in its previous ruling.

Ford manufactured and sold medium and heavy-duty pickup trucks that contained the 6.4-liter Super Duty diesel engine ("6.4L engine"). SAC ¶ 10. With the trucks using this 6.4L engine, Ford issued a transferrable manufacturer's New Vehicle Limited Warranty that covered the vehicle for five years or for the first 100,000 miles driven, whichever occurred first. *Id.* ¶ 26; Pls.' Mem. Opp'n Ex. A ("Warranty") at 8, ECF No. 63-1.[4] The warranty provided in part:

> Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights. You may have other rights that vary from state to state. Under your New Vehicle Limited Warranty if:
>
> - your Ford vehicle is properly operated and maintained, and
> - was taken to a Ford dealership for a warranted repair during the warranty period,

---

[4] RoadSafe and Darne did not attach the warranty to the SAC, but the warranty is central to their claims, they refer to it heavily in the SAC, and they attach it to their Memorandum in Opposition to Ford's Motion to Dismiss. *See Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439 (7th Cir. 1994) (plaintiff may raise new factual allegations for the first time in a response brief on a 12(b)(6) motion if the new allegations are consistent with the complaint); *Holladay v. CME Grp.*, No. 11-CV-8226, 2012 WL 3096698, at *2 (N.D. Ill. July 30, 2012) ("[T]he Seventh Circuit has held that new factual allegations can be raised for the first time in a brief, if the new allegations are consistent with the complaint."). The Court also previously considered the warranty when it was Ford that attached it to its previous Motion to Dismiss, and will consider it once again here. *See Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.").

then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

This warranty does not mean that each Ford vehicle is defect free. Defects may be unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs. For this reason, Ford provides the New Vehicle Limited Warranty in order to remedy any such defects that result in vehicle part malfunction or failure during the warranty period.

The remedy under this written warranty, and any implied warranty, is limited to repair, replacement, or adjustment of defective parts. This exclusive remedy shall not be deemed to have failed its essential purpose so long as Ford, through its authorized dealers, is willing and able to repair, replace, or adjust defective parts in the prescribed manner. Ford's liability, if any, shall in no event exceed the cost of correcting manufacturing defects as herein provided and upon expiration of this warranty, any such liability shall terminate.

Warranty at 8-9; *see also* SAC ¶ 26. Purchasers who wished to extend their warranty coverage beyond the five-year or 100,000-mile coverage period could purchase an extended service plan. Warranty at 34. The warranty also contains a choice-of-law provision which states that the law of the state in which the vehicle was purchased governs all questions of enforceability and interpretation of the warranty. Warranty at 7.

Darne is a North Carolina resident and purchased a 2008 F-450 Super Duty XLT truck with a 6.4L engine on May 14, 2009, from a dealership in North Carolina. SAC ¶ 14. Before buying his truck, Darne reviewed the warranty that Ford provided with the vehicle. *Id.* ¶ 15. Based on Ford's representation that, in the plaintiffs' words, Ford "would repair or replace any defective parts or components in the Truck during the warranty period," Darne decided against purchasing an extended warranty plan. *Id.* ¶ 15. Darne also alleges that had it not been for that representation, he would not have purchased the vehicle. *Id.* After buying the truck, Darne

experienced problems related to "common root cause defects" with the engine, including seeing white smoke emanating from the engine, repeated radiator failures that required replacement, the failure of two exhaust gas temperature sensors, a broken lift, a broken camshaft, and a total failure and loss of power that required the vehicle to be towed on four occasions. *Id.* ¶ 16.

Because of those problems, Darne brought his truck in for service several times: (1) In August 2009 (when the truck had been driven 18,976 miles), Darne complained that the cooling fan turned off, the engine was overheating, and the defroster was not producing hot air, so Finish Line Ford replaced the radiator; (2) In March 2010 (when the truck had been driven 59,978 miles), Mooresville Ford replaced the gas temperature sensor twice and replaced the diesel particulate filter after the check engine light appeared and the truck failed to restart; and (3) On April 15, 2011 (when the truck had been driven 125,148 miles and, thus, was outside the warranty period), Darne had the truck towed to a Ford dealer when the truck experienced issues of "running rough and cylinders 'missing'" caused by premature wearing of the camshaft and valve lifters. *Id.* ¶ 17. On that third occasion, Darne paid $440 for troubleshooting because the vehicle was no longer under warranty, and the Ford dealer informed him that a complete diagnosis of the engine problems would cost "upwards of $3,000." *Id.* ¶ 17. In an April 20, 2011 email exchange with the Ford Customer Relationship Center, Darne was told that given the truck's mileage, he would have to pay for any repairs necessary to fix any defective engine parts. *Id.* ¶ 18. Darne asserts that the Ford dealerships' attempts to repair the engine "were inadequate and unsuccessful," and that the vehicle's problems resulted from the 6.4L engine's "common root cause defects in the defective oil cooling system, the defective [Engine Gas Recirculation] coolers, and the oversized radiator." *Id.* ¶ 20, 22. At the time those defects appeared, Darne alleges, the truck was in substantially the same condition as when Ford placed it into the stream

of commerce and Darne was operating it as intended and in a manner foreseeable by Ford. *Id.* ¶ 21.

RoadSafe has its principal place of business in Chicago, Illinois, and is the limited partner of—with a 99 percent ownership interest in—Delaware limited partnership RoadSafe Traffic, LP. *Id.* ¶ 23. RoadSafe Traffic, LP "holds title" to sixty-five Ford vehicles containing 6.4L engines, which the plaintiffs list in their complaint by vehicle number, and has "assigned all of its rights related to" those vehicles to RoadSafe, the plaintiff. *Id.* RoadSafe asserts that before purchasing the listed trucks, it reviewed Ford's warranty, and that but-for Ford's representation regarding repairs and replacements—which the complaint again characterizes as providing for "repair or replacement of any defective parts" during the warranty period—RoadSafe would not have purchased the trucks. *Id.* ¶ 24. RoadSafe alleges that its trucks have spent months in repair shops because of problems with the 6.4L Engine, and provides a "sampling" of repairs, some during the warranty period and some not, in connection with four of those vehicles. *Id.* ¶ 25. Those alleged repairs are discussed in more detail below, in the Discussion section of this Opinion, but for each RoadSafe asserts that the engine's "common root defects" caused the issues. *Id.* ¶ 25.

Darne and RoadSafe allege that because of Ford's "failure to properly repair its 6.4L engines" during the warranty period, the plaintiffs' and proposed class members' engines broke down after the warranty expired and those customers were no longer able to use their vehicles. *Id.* ¶ 27. The plaintiffs further assert that Ford has "actual knowledge" of the defects and the plaintiffs' and class members' demands for repair because the plaintiffs and proposed class members notified Ford through its Customer Relationship Center, and indirectly through Ford's dealerships, of the 6.4L Engine's problems. *Id.* ¶ 28. Darne received a complaint number from

Ford, but the auto manufacturer refused to take action. *Id.* Since purchasing their vehicles, RoadSafe and Darne have both "properly maintained their vehicles and consistently had them serviced according to the manufacturer's scheduled routine maintenance." *Id.* ¶ 13.

The plaintiffs also allege that while Ford refused to properly repair the 6.4L engine's defects under its warranty, it had internally recognized that the engine had significant problems. *Id.* ¶ 30. For this point, Darne and RoadSafe point to Ford-issued Technical Service Bulletins ("TSBs"), which are issued by automakers to alert automotive technicians about problem areas, repair procedures, and service techniques for vehicles. *Id.* ¶ 31. The plaintiffs—just as in their prior complaint—do not identify any specific TSB alerts by date, but note that a search of the TSB database reveals 35 TSBs that Ford released for vehicles equipped with 6.4L engines related to the engine, engine cooling, the fuel system, the transmission, and other components. *Id.* Darne and RoadSafe assert that the TSB alerts indicate Ford knew about the engine's problems, and allege that unless a consumer is knowledgeable about the database run by the National Highway Traffic Safety Administration, the owner "never sees or hears of the [TSB alerts] issued to automotive dealers." *Id.* The plaintiffs also point to a recall Ford issued in April 2007 for F-450 Super Duty trucks containing the 6.4L engine, saying the excessive temperature defect in that recall and the accompanying symptoms of "lack of power or rough operation, unusual noises from the engine or exhaust, white smoke from the exhaust, and visible flames out of the tailpipe" mirrored the alleged defects and symptoms the plaintiffs' vehicles experienced. *Id.* ¶ 32.

Darne and RoadSafe assert that the 6.4L engines have "inherent" and "permanent" defects which cannot be corrected. *Id.* ¶ 33. They allege that despite Ford's knowledge of the defects, it has fraudulently denied that the problems exist and marketed the engine as being fit to

power its vehicles. *Id.* ¶ 34. The plaintiffs allege that they and the proposed class members have incurred costs to repair their vehicles, and have been damaged by the significant loss in their vehicles' fair market value. *Id.* ¶ 34. The engine's defects have led to an increased likelihood that the engine will fail during operation and cause accidents involving property damage, personal injury, and death, the plaintiffs assert. *Id.*

Darne launched this litigation in May 2013, when he filed a class complaint against Ford and the engine supplier Navistar, Inc. *See* Compl., ECF No. 1. Those defendants filed motions to dismiss that original complaint, and Darne and RoadSafe then dismissed Navistar and lodged their First Amended Complaint in November 2013, alleging counts for breach of warranty and violations of various state consumer protection statutes. *See* Stipulation, ECF No. 38; Am. Compl., ECF No. 36. This Court granted Ford's motion to dismiss that complaint without prejudice, *see* Mem. Op. and Order, ECF No. 52, and Darne and Ford then filed their SAC. Now before the Court is Ford's motion to dismiss that pleading pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b). *See* Mot. to Dismiss, ECF No. 59.

## DISCUSSION

Federal pleading standards apply to the state law claims Darne and RoadSafe have alleged in this federal court. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 671-72 (7th Cir. 2008). To defeat a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). Rule 8(a)(2) requires just "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though that standard does not require a plaintiff to bring "detailed factual allegations," the Supreme Court has made clear that Rule 8(a) requires more than "labels and conclusions," and that "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## I. Express Warranty

RoadSafe asserts a claim for breach of express warranty on behalf of itself, the Nationwide Class, and the Illinois Class in Count I of the SAC. SAC ¶¶ 48-59. As discussed in this Court's prior Opinion, the warranty at issue here contains a choice-of-law provision. Because the parties do not dispute the validity of that provision, this Court will apply it in this case. *See Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir. 1998) ("[I]t is the exceptional circumstance that a federal court, or any court for that matter, will not honor a choice of law stipulation."). The warranty's choice-of-law provision provides that the law of the state in which the litigant purchased the Ford vehicle governs all questions of enforceability and interpretation. Warranty at 7. Ford argues elsewhere in its brief that RoadSafe has not properly alleged that it purchased its vehicles—at least, the four vehicles it discusses in any detail in the complaint—in Illinois because RoadSafe only states that those vehicles were "delivered" by a dealer in Illinois. *See* Def.'s Mem. Supp. at 10 (arguing that RoadSafe lacks standing for its ICFA claim); SAC ¶ 25. But the parties both rely on Illinois law for their breach of warranty arguments, and thus appear to agree that Illinois law governs this claim. This Court therefore applies the law of Illinois below.

Notably, the warranty at issue here is not an "express warranty" under Illinois law, despite plaintiffs' attempts to color it as such. Rather, Ford's warranty is a limited repair warranty. In *Mydlach v. DaimlerChrysler Corp.*, 875 N.E.2d 1047 (Ill. 2007), the Illinois Supreme Court made clear that repair warranties promising "only that the manufacturer will repair or replace defective parts during the warranty period"—without any promise that the product will "conform to some affirmation, promise, description, sample or model"—are not express warranties under the Illinois Uniform Commercial Code. *Id.* at 1058-59. Notwithstanding their conclusory statement that the engine "is expected to perform for 500,000 miles," the plaintiffs have not alleged any facts that could plausibly indicate that Ford made such promises regarding the engines' quality or conformity, and so they cannot state a claim for breach of express warranty.  In reaching that holding, the court in *Mydlach* cited with approval *Cosman v. Ford Motor Co.*, 674 N.E.2d 61 (Ill. App. Ct. 1996), in which the Illinois Appellate Court explained that a repair warranty "warrants only that the dealer will repair, replace, or adjust defects if parts of the [product] in fact do malfunction." *Id.* at 66. Such a warranty constitutes "a promise that the **manufacturer** will behave in a certain way, not a warranty that the **vehicle** will behave in a certain way." *Id.* (emphasis added); *see also Singer v. Sunbeam Prods., Inc.*, No. 15 C 1783, 2016 WL 1697777, at *3 (N.D. Ill. Apr. 28, 2016) (quoting same). As in *Cosman*, breach of the repair warranty at issue in the current suit "cannot occur until Ford refuses or fails to repair [the engine] if and when it breaks" during the period covered by the warranty. *See Cosman*, 674 N.E.2d at 68; *see also Snyder v. Komfort Corp.*, No. 07 C 1335, 2008 WL 2952300, at *4 (N.D. Ill. July 30, 2008) (performance under a limited warranty "is triggered if a covered defect arises requiring repair," and to establish a breach of such a warranty, a plaintiff "must show that she afforded [the warranty issuer] an opportunity to comply with its

obligations under the limited warranty and that [the issuer] failed to do so"). Such a repair and replacement limited warranty is permitted under the UCC's provision governing contractual modifications and limitations of remedies, as codified by Illinois at 810 ILL. COMP. STAT. 5/2–719(1)(a). *See Snyder*, 2008 WL 2952300, at *4 (citing same statutory provision in relation to repair and replace warranty).[5]

The warranty in this case provided coverage for the 6.4L engine for five years or until the vehicle had been driven 100,000 miles, whichever happened first. *See* Warranty at 8. Thus, as this Court previously made clear, RoadSafe must at least state the date it purchased the vehicle in question, as well as either the date that a given problem appeared or the number of miles the vehicle had been driven when the problem appeared, in order to establish that the alleged issues fell within the covered period. *See* Mem. Op. and Order at 10. RoadSafe makes specific allegations in connection with only four of its vehicles, and so it is only those vehicles this Court will consider in evaluating the sufficiency of RoadSafe's pleading.

---

[5] The fact that the warranty at issue in this case is a limited repair warranty, and not an express warranty concerning the quality of the 6.4L engines, poses a substantial question as to whether a class of 6.4L engine-owners could be certified even if either of the plaintiffs had stated an individual claim. Though RoadSafe defines the proposed classes as including persons who purchased or leased Ford vehicles with the 6.4L Engine "that required one or more repairs" covered by the warranty to certain vehicle components, *see* SAC ¶¶ 36-37, this Court has already recognized that the warranty does not guarantee that the vehicles will *not require* repairs. Rather, any certifiable class here would necessarily be limited to buyers and lessees whose under-warranty vehicles Ford either refused to repair at no cost, or repaired in an ineffective manner. Further, as this Opinion demonstrates, evaluating any such claim is a highly fact-intensive exercise requiring an evaluation of the date, place, and cause of each sought-after repair for each individual vehicle; whether the owner/lessor brought the vehicle to a Ford dealer or some other business; whether the dealer refused to cover the cost of repair or not; whether the repair was effective or not; and, of course, whether the repair even fell within the warranty period. In short, there remain substantial questions about whether the proposed class could satisfy the requirements of Federal Rule of Civil Procedure 23.

In the latest iteration of the complaint, RoadSafe asserts that it purchased the vehicle dubbed VE3508 on August 17, 2007. SAC ¶ 9. On November 4, 2008, when the vehicle had 33,996 miles on it, the engine began leaking oil and the vehicle displayed the "water in fuel" light even after being drained. *Id.* ¶ 25(1)(b). RoadSafe asserts that it brought the vehicle to an authorized Ford dealership for repair that same day, and alleges that the dealership "failed to properly repair the engine, instead making only minor repairs that failed to address the defect causing the engine to malfunction." *Id.* ¶ 25(1)(b)-(c).

RoadSafe argues generally that its claim in the SAC is not now that the engine was defective, but that Ford breached its repair warranty by not adequately repairing the problems presented with respect to these vehicles. That characterization is belied by its complaint, however, in which it alleges that the defects in the 6.4L engines are unrepairable: "The defects are of an ***inherent*** and ***permanent*** nature ***which cannot be satisfactorily corrected by repairs or replacement of parts*** to the engine, cooling system, and related components." SAC ¶ 33 (emphasis added). A claim that Ford failed to repair the unrepairable is a non-sequitur; what RoadSafe is really asserting is that Ford did not effectively remove, *redesign,* and replace the VE3508 vehicle's engine with one free from such inherent and permanent defects; nothing short of that could have resolved the "inherent" and "permanent" problems the plaintiffs allege. But again, Ford expressly acknowledged the possibility that the engine had defects. It did not promise a defect-free engine; it promised to repair the problems those defects caused during a limited period.

Even viewed from the context of a claim for failure to adequately repair the problems, moreover, the SAC's allegations are still wanting. With respect to VE3508, for example, RoadSafe admits that Ford did, in fact, make "minor repairs," and does not allege that the

specific issues for which it sought those repairs—the leaking engine and the "water in fuel"

light—continued or recurred. Rather, the SAC alleges that the next problem occurred at about

82,000 miles (almost 50,000 miles later), when the engine threw a belt and required replacement

of the "A/C compressor, clutch assembly, serpentine belt, and belt tensioner assembly." *Id.* at

¶ 25(1)(e). To the extent that RoadSafe claims to have alleged that a failure to adequately repair

the original problem caused the need for the later repair, the allegations of the complaint are

woefully inadequate; they provide no plausible basis to infer a causal relationship between the

repair of an oil leak and the subsequent need to repair the A/C compressor. What the complaint

does allege is that each of these problems was caused by some "inherent" and "permanent"

defect in the engine, but that brings us back to the fundamental point that Ford did not promise a

defect free engine; Ford promised to make repairs addressing problems that such defects caused

within the warranty period. With one exception, noted below, the complaint does not allege that

Ford failed to make such repairs. What it alleges is that the defects should have been eliminated

altogether, something that would have been possible only had a new and different (defect-free)

engine been provided. That is not what the warranty promised.[6]

RoadSafe also alleges that it paid for various additional repairs for the VE3508 vehicle,

but these all concerned problems that appeared when the vehicle had more than 100,000 miles

and was therefore no longer covered by the warranty. RoadSafe argues in its brief that it alleges

these repairs so as to "show additional damages resulting from Ford's failure to properly repair

---

[6] This incident also fails to support a breach of warranty claim because RoadSafe does not allege that it took the vehicle to a Ford dealership, as required by the warranty. *See* Warranty at 12 (providing that "Ford Motor Company Dealers" will provide certain repairs if the vehicle is "taken to a Ford dealership"). RoadSafe had the vehicle towed to Atomic Transmission in Villa Park, Illinois. SAC ¶ 25(1)(e). RoadSafe does not allege that this was a Ford dealership, and the fact that RoadSafe paid $1,621.23 for this repair indicates that it was not. *See* Warranty at 3 (providing owners "will not be charged for repairs covered by any applicable warranty during the stated coverage guides").

its 6.4L Engines during the warranty period." Pls.' Mem. Opp'n at 3. But RoadSafe alleges no facts that support any inference that subsequent problems occurred because the original repairs were inadequate. What it alleges is that the same "inherent" and "permanent" defects in the engine caused these problems, too. That may be true, but Ford promised to repair problems caused by such defects only to the extent that they occurred within the first 100,000 miles of the vehicle's operation. The warranty did not obligate Ford to repair problems that arose after that point.

RoadSafe also purchased a vehicle it calls VE3509 on August 13, 2007. *Id.* ¶ 25(3)(a). As to this vehicle, RoadSafe's only specific allegation is that on April 22, 2010, when the VE3509 had 80,099 miles, the vehicle "required a complete engine replacement," and that RoadSafe "was required to pay $13,1010.01" for that repair. *Id.* ¶ 25(3)(b). RoadSafe does not identify the dealership or auto shop that performed this repair, however, and does not allege that a Ford authorized dealer performed the repair or refused to cover the repair cost. Contrary to RoadSafe's arguments, RoadSafe cannot satisfy the applicable pleading requirements on the basis of those limited allegations and its blanket statement that "Ford dealership[s] did not repair Plaintiffs' and the Class Members' 6.4L Engines or performed an inadequate repair of the 6.4L Engines." *See* Pls.' Mem. Opp'n at 5-6; SAC ¶ 26. This Court has already made clear that RoadSafe must allege specific instances in which it presented vehicle problems to a Ford dealer, and that this dealer in turn failed to make appropriate repairs. *See* Mem. Op. and Order at 11-12. The same shortcomings doom RoadSafe's allegations regarding the vehicle identified as VE3518, which RoadSafe alleges it purchased on August 31, 2007. SAC ¶ 25(4)(a). That vehicle required repairs on July 15, 2010 at 77,749 miles, when RoadSafe paid Diesel Service Center $599.38 to replace the exhaust gas temperature sensors, as well as $341.35 for towing. *Id.*

¶ 25(4)(b). RoadSafe does not allege that it brought the VE3518 vehicle to a Ford dealer, or that such a dealer refused to cover the cost of the repair. The subsequent repair RoadSafe alleges for the VE3518 vehicle fell outside the warranty period. The allegations regarding this vehicle, therefore, cannot support a breach of warranty claim.

The only other vehicle for which RoadSafe makes specific allegations regarding repairs is vehicle VE3510, which it also purchased on August 13, 2007. SAC ¶ 25(2)(a). After an initial repair that RoadSafe alleges it paid for in February 2010—which this Opinion discusses in due course—RoadSafe alleges a number of additional repairs for the vehicle, none of which can support a breach of warranty claim based on the facts asserted in the current complaint. RoadSafe asserts that it had the vehicle towed to Freeway Ford Truck Sales in Lyons, Illinois, on November 12, 2010, when the vehicle had 84,032 miles on it. SAC ¶ 25(2)(f). The issue was the "engine shutting down," and RoadSafe paid $510.78 to replace the exhaust gas temperature sensors. *Id.* Even assuming that the name "Freeway Ford Truck Sales" is sufficient to establish that this was a Ford authorized dealership, however, RoadSafe does not assert that Ford refused, let alone wrongfully refused, to cover the cost of the repair, or that the repair itself did not effectively address the engine shut-down issue. RoadSafe also fails to allege that M&A Precision Truck Repair, where it had the vehicle towed on April 29, 2011 when it had 94,121 miles on it, was a Ford-authorized dealer, and again simply alleges that RoadSafe paid $5,512.10 to replace various components rather than specifically asserting that Ford refused to cover those costs. *Id.* ¶ 25(2)(g). Finally, the repair RoadSafe alleges was necessary when the vehicle had 123,558 miles on it falls outside of the warranty coverage period, and thus cannot support a claim for breach of warranty. *See id.* ¶ 25(2)(h).

Of all the alleged instances in which RoadSafe sought repairs, the occurrence in which the VE3510 vehicle malfunctioned on February 15, 2010, when it had 51,593 miles on it, is the only incident within the warranty period as to which RoadSafe claims that an authorized Ford dealer failed to repair the problem presented. RoadSafe asserts that on that occasion, the vehicle's "water in fuel" light came on and remained that way even after the vehicle was drained. *Id.* ¶ 25(2)(b). RoadSafe specifically alleges that it took the vehicle to an authorized Ford dealership that day, but alleges that Ford refused to cover the repair, "blaming the malfunction on the customer despite knowing that this was a common malfunction caused by the common engine defect." *Id.* ¶ 25(2)(c)-(d). RoadSafe specifically asserts that the issue was caused by a defect in the diesel engine cooling system. *Id.* ¶ 25(2)(b). Because of Ford's refusal, RoadSafe alleges that it paid $11,074.43 for the repair. *Id.* ¶ 25(2)(e).

Ford argues that its dealership's refusal to provide this repair cannot support a claim for breach of the warranty because RoadSafe does not allege that it complied with the warranty's terms. Def.'s Mem. Supp. at 4. As Ford notes, the warranty requires that the vehicle be "properly operated and maintained," and specifies that the warranty does not cover damage caused by the use of "contaminated or improper fuel/fluids;" "misuse of the vehicle, such a driving over curbs, overloading, racing or using the vehicle as a permanent stationary power source;" or alterations or modifications of the vehicle, such as "tampering with the emissions systems" or "installation of a non-Ford Motor Company part." Def.'s Mem. Supp. at 5; Warranty at 8, 12-13. RoadSafe argues in response that it has alleged its own compliance with the warranty, pointing to the current complaint's assertion that RoadSafe "properly maintained [its] vehicles and consistently had them serviced according to the manufacturer's scheduled routine maintenance." *See* Pls.' Mem. Opp'n at 5; SAC ¶ 13. Ford argues, however, that RoadSafe does not allege any facts to

show that it properly maintained this particular vehicle, and fails to allege any facts at all to show that it complied with the warranty's other requirements. Def.'s Mem. Supp. at 5.

RoadSafe's statement that it properly maintained all of its vehicles is insufficient to support its own compliance with the warranty at the pleading stage. This is true for the same reason that RoadSafe's blanket, non-specific allegation that "Ford failed to repair the engines" is insufficient to establish a breach. RoadSafe points to the general (and conclusory) allegation in the SAC that it "properly maintained [its] vehicles," SAC ¶ 13, but as Ford notes, it "identifies no facts showing that it properly maintained *this* vehicle, much less that it complied with the other conditions described above that were otherwise necessary to entitle RoadSafe to a free warranty repair." Def.'s Mem. Supp. at 5. Accordingly, RoadSafe has failed to plead any facts supporting a plausible inference that it met the requirements necessary to trigger Ford's obligation under the warranty to repair the vehicle. "[S]keletal allegations simply mirroring the elements" of a claim do not satisfy federal pleading standards; *Twombly* and *Iqbal* require "some specific factual detail to color . . . bare conclusory allegations." *Yeftich v. Navistar, Inc.,* 722 F.3d 911, 916 (7th Cir. 2013) (affirming dismissal of complaint based on failure to allege specific facts to support conclusory claim of non-performance by union). That is true whether the deficient allegations concern the defendant's performance under the contract or the plaintiff's. *See, e.g.*, *Caren v. Collins*, No. 16-3573-CV, 2017 WL 3587488, at *2 (2d Cir. Aug. 21, 2017) (affirming dismissal of complaint based on the plaintiffs' failure to allege that they satisfied condition precedent); *Tatten v. Bank of Am. Corp.*, 562 Fed. App'x 718, 721 (10th Cir. 2014) (affirming dismissal of breach of contract claim as implausible where plaintiff failed to allege his own substantial performance of contractual obligations); *Golden v. Wells Fargo Bank, N.A.*, 557 Fed. App'x 323, 328 (5th Cir. 2014) (affirming dismissal of claim where plaintiffs failed to

allege that they performed their contractual obligations); *cf. Vill. of South Elgin v. Waste Mgmt. of Ill., Inc.*, 810 N.E.2d 658, 669 (Ill. App. Ct. 2004) ("performance by the plaintiff of all required conditions" is an element of an Illinois breach of contract cause of action). Accordingly, RoadSafe has failed to state a claim as to VE3510. And since the SAC represents its third attempt to do so, no further efforts are warranted.

Even had RoadSafe adequately alleged facts to support a claim that Ford breached its obligation to repair the truck's engine, its claim would still fail because it never gave Ford pre-suit notice of the alleged breach. *Id.* at 7. The Illinois UCC requires that plaintiffs "directly notify the seller of the troublesome nature of the transaction or be barred from recovering for a breach of warranty." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 492 (Ill. 1996); see also 810 ILL. COMP. STAT. 5/2–607(3)(a)) (requiring that a "buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy"). Ford argues that bringing a vehicle to a Ford dealer for repair does not, on its own, satisfy this requirement, and asserts that filing a lawsuit that does not allege any personal injury also falls short. *Id.* Given the disposition of this Opinion, the only alleged repair for which notice remains potentially relevant is the February 2010 repair on the VE3510 vehicle.

RoadSafe has not adequately alleged pre-suit notice in that instance. RoadSafe asserts that it brought the vehicle to a Ford-authorized dealer, and that this dealer refused to cover the cost of repair. That refusal *is* the alleged breach; a breach of the warranty at issue here could not occur when the vehicle required repairs in the first place—again, the limited repair warranty did not promise that the engine would never require repairs—but instead when the dealer refused to perform by providing a cost-free repair. *See Mydlach*, 875 N.E.2d at 1059 ("Performance under a vehicle manufacturer's promise to repair or replace defective parts is due not at tender of

delivery, but only when, and if, a covered defect arises and repairs are required.") RoadSafe does not allege that it ever notified Ford—the manufacturer and defendant—of this alleged breach before bringing suit.

There are two exceptions to the UCC's requirement that the buyer give the seller direct notice of the alleged breach, but neither apply here. "Direct notice is not required when (1) the seller has actual knowledge of the defect of the particular product; or (2) the seller is deemed to have been reasonably notified by the filing of the buyer's complaint alleging breach of UCC warranty." *Connick*, 675 N.E.2d at 589 (citations omitted). Even under the first exception, however, a plaintiff must show that "the manufacturer is somehow apprised of the trouble with the ***particular*** product purchased by a ***particular*** buyer." *Id.* at 590 (emphasis added). Any generalized allegation that RoadSafe complained to Ford's Customer Relationship Center, without any allegation identifying which vehicle and which alleged breach it identified in a particular complaint to Ford, is therefore insufficient. RoadSafe also fails to qualify for the second UCC notice exception, which only benefits consumer plaintiffs when their complaint asserts that they suffered a personal injury. *See id.* at 590-91 ("The reason for this distinction is that where the breach has not resulted in personal injury, the UCC indicates a preference that the breach be cured without a lawsuit."). It is now impossible, of course, for RoadSafe to provide pre-suit notice of the alleged breach of warranty to Ford; the plaintiffs filed their suit in 2013, and cannot now unring that bell. *See Ibarrola v. Kind, LLC*, 83 F. Supp. 3d 751, 761 (N.D. Ill. 2015) ("[T]he purpose of the notice requirement is to provide an incentive for parties to resolve warranty disputes ***prior*** to filing suit.") (emphasis added).

For all of these reasons, then, Count I is dismissed with prejudice.

## II. Illinois Consumer Fraud Act

RoadSafe alleges that at the time Ford sold the vehicles at issue, Ford knew both that the 6.4L engines were defective and that it could not repair those defects. SAC ¶ 63. RoadSafe asserts that Ford's representation in the warranty that it would "repair any defects in its trucks equipped with 6.4L engines was deceptive and unfair," and that Ford also engaged in deceptive and unfair practices when it failed to disclose the "common root cause defects inherent to [sic]" the 6.4L engine. *Id.* ¶¶ 63-64. RoadSafe alleges that it was deceived by Ford's representation regarding its "ability to repair defects" in the 6.4L engine, and that it and the national and Illinois proposed class members relied on Ford's "misrepresentations and omissions" when they purchased Ford vehicles containing the 6.4L engines. *Id.* ¶ 65.

To state an ICFA claim, a plaintiff must allege "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer*, 922 N.E.2d 309, 313 (Ill. 2009). A plaintiff must "actually be deceived" by the defendant's statement or omission in order to prove that the defendant's conduct proximately caused the plaintiff's damages. *Id.* at 316.

Unlike in the prior complaint, RoadSafe does now allege that it reviewed the warranty "[p]rior to purchasing" its trucks, and that but for the representation that Ford "would repair or replace any defective parts or components" in those trucks, it would not have bought the vehicles. SAC ¶ 23. But Ford argues, correctly, that RoadSafe's misrepresentation theory—that Ford misrepresented its ability to perform repairs on the vehicles—actually rests on a mischaracterization of the warranty. *See* Def.'s Mem. Supp. at 8. Ford's warranty does not say that Ford would "repair any defects," but points instead to the warranty's language that Ford would repair parts "that malfunction or fail during normal use during the applicable coverage

period due to a manufacturing defect in factory-supplied materials or factory workmanship." *Id.*; Warranty at 9. The warranty also never promised to install an alternatively designed, defect-free engine if the original engine displayed any problems, Ford asserts. *Id.* (citing warranty language that provides: "Nothing in this warranty should be construed as requiring defective parts to be replaced with parts of a different type or design than the original part, so long as the vehicle functions properly with the replacement part." Warranty at 9.).

RoadSafe argues in response that the question of whether the defects its vehicles experienced were manufacturing defects or design defects is a question of fact. Pl.'s Mem. Opp'n at 8. That may be true, but it is irrelevant. The Court need not consider the category of the engine's alleged defect in order to evaluate whether RoadSafe has stated an ICFA claim. Ford is correct that that warranty does not guarantee a brand-new engine free of defects, whether defects of design, manufacturing, or both. Rather, it promised repair. And to the extent that RoadSafe bases its ICFA claim on an alleged misrepresentation that Ford's repairs would remedy the problems vehicles experienced because of such a defect—a leaking engine or malfunctioning warning lights, for example—RoadSafe has, as discussed above, failed to adequately allege any repairs that did not remedy those problems. RoadSafe's misrepresentation theory fails because the plaintiff has not pointed to any act or practice that was deceptive, as required to state an ICFA claim.

RoadSafe also appears to be pursuing the theory that Ford is liable under the ICFA because of an omission, in that it failed to disclose that the engine was defective and that it could not repair the alleged defects despite its knowledge of those circumstances. *See* SAC ¶ 23. Under the ICFA, an "omission" is an omission from a communication, rather than a general failure to disclose. *See De Bouse*, 922 N.E.2d at 316 ("If there has been no communication with the

plaintiff, there have been no statements and no omissions."). The only communication Ford made to buyers concerning its 6.4L engines, however, is the warranty, and this Court noted in its prior Opinion that RoadSafe initially failed to state when it reviewed the warranty or whether the warranty's provision of free repairs to defective parts induced its purchase. *See* Mem. Op. and Order at 21 (citing *De Bouse*, 922 N.E.2d at 316 ("If a consumer has neither seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause.")). RoadSafe has added those allegations to its current complaint, but it has not overcome its initial failure to allege that Ford omitted to inform consumers about defects in the engine at the time it sold the vehicles, even though it knew about the defects at that time. *See id.*

RoadSafe once again cites to TSB alerts that Ford issued, as well as to a 2007 recall of another vehicle containing the 6.4L engine. RoadSafe again fails to allege the dates of any of the TSB alerts, but the Court may once again take judicial notice of those alerts, which are publicly available[7] and appear to have first issued in connection with the engine in March 2008. *See Service Bulletins-Search Results, Ford 2008 F Super Duty*, NHTSA, https://www-odi.nhtsa.dot.gov/cars/problems/tsb/results.cfm. These TSB alerts all occurred, therefore, after the purchase of the four vehicles for which RoadSafe has identified a purchase date, and provide no support for the assertion that Ford knew about any alleged defect at the time of those sales. As for the April 2007 recall, RoadSafe argues that the recall demonstrates that Ford knew there was a defect that could not be repaired, that replacement of some kind was required, and that Ford still failed to disclose that the defect was also present in the vehicles at issue in this case. *See*

_____

[7] RoadSafe again acknowledges that these alerts are publicly available, *see* SAC ¶ 31, and this Court will once again note that it may take judicial notice of the availability of public documents online. *See Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008) ("We may take judicial notice of documents in the public record . . . without converting a motion to dismiss into a motion for summary judgment.").

Pl.'s Mem. Opp'n at 9. The fact remains, however, that the warranty explicitly stated that the vehicle may have defects. As to RoadSafe's argument that the recall shows Ford knew it could not repair those defects, RoadSafe has failed—as this Court has noted multiple times—to adequately allege that any of Ford's specific repairs were indeed unsuccessful. An allegation that Ford issued a recall for a separate vehicle model containing the same engine cannot, on its own, adequately support RoadSafe's assertion that Ford *actually* could not, and *knew* it could not, perform effective repairs. Indeed, any inference arising from the recall would run the other way; the point of a recall is to fix the designated problem.

RoadSafe's allegations that Ford failed to disclose known defects to consumers are particularly deficient given the heightened pleading standard of Rule 9(b) that applies to the ICFA claim, which sounds in fraud. An ICFA claim sounding in fraud must satisfy that heightened standard, which requires a complaint to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). "While the precise level of particularity required under Rule 9(b) depends upon the facts of the case, the pleading ordinarily requires describing the who, what, when, where, and how of the fraud." *Camasta*, 761 F.3d at 736 (quoting *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011)) (internal quotation marks omitted).

As noted, and as in its previous complaint, RoadSafe has failed to point to a communication by Ford containing a misrepresentation or omission. As this Court previously explained, the warranty expressly states that the engine may have defects, and the TSB alerts and 2007 recall cannot support an allegation of omission. RoadSafe has also failed to allege facts that suggest that the warranty's representation of repairs was a misrepresentation. Although it does allege that single instance—in February 2010, in connection with the VE3510 vehicle—where

Ford refused to cover the cost of a repair while a vehicle was under warranty, the SAC itself notes that Ford's stated basis for the refusal was that the customer was responsible for the malfunction. *See* SAC ¶ 25((2)(d). The warranty required that vehicles be "properly operated and maintained" in order to qualify for repairs at no cost. Warranty at 8. Without any particularized pleadings as to why Ford's basis for its refusal was unfounded, therefore, RoadSafe cannot adequately allege that the warranty's repair provision constituted a misrepresentation. RoadSafe's blanket allegation that it maintained its vehicles cannot stand in for specific allegations as to how it cared for this particular vehicle, the period of time during which it provided that care, and whether that care was in accordance with the warranty's specifications of what consumer conduct will and will not support a repair request.

RoadSafe has therefore once again failed to plead with particularity that Ford made a misrepresentation or omission, that Ford intended RoadSafe to rely on such a misrepresentation or omission, or that such a misrepresentation or omission damaged RoadSafe. The ICFA claim is therefore dismissed with prejudice.

## III. North Carolina Uniform Deceptive Trade Practices Act

For many of the same reasons, the NCUDTPA claim Darne brings on behalf of the proposed North Carolina class also fails. To establish a claim for unfair trade practices in North Carolina, "a plaintiff must show: (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226 (N.C. 2013). A claim of misrepresentation under the NCUDTPA requires a plaintiff "to demonstrate reliance on the misrepresentation in order to show the necessary proximate cause." *Id.*

Darne's NCUDTPA claim largely echoes RoadSafe's ICFA allegations; he bases this claim on the allegation that Ford sold vehicles containing the 6.4L engines to Darne knowing that the engines were defective and that Ford could not repair those defects. SAC ¶ 76. Darne asserts that the warranty's representation that Ford would repair "any defects" was deceptive and unfair, that this representation deceived Darne, and that Darne relied on that representation. *Id.* Darne further alleges that information about the "common root cause defects" was material to a consumer's decision of whether to purchase the vehicle and how much to pay for it, and that Ford owed Darne and the proposed North Carolina class members a duty to disclose those defects. *Id.* ¶¶ 79-80.

Darne once again argues in his brief that Ford concealed a material fact by failing to disclose the allegedly inherent design problems in the 6.4L engine before he purchased his Ford vehicle. Pl.'s Mem. Opp'n at 12. Concealment of a material fact can form the basis of a NCUDTPA claim where the party has a legal duty to communicate, which may arise where the parties negotiated at arm's length and "one party takes affirmative steps to conceal materials facts from the other" or "one party has knowledge of a latent defect in the subject matter of the negotiations of which the other party is ignorant and which it is unable to discover through reasonable diligence." *Bear Hollow, LLC v. Moberk, LLC*, No. 5:05CV210, 2006 WL 1642126, *6 (W.D. N.C. June 5, 2006) (citing *Harton v. Harton*, 344 S.E.2d 117, 119 (N.C. Ct. App. 1986)). Darne's concealment argument is contradicted, however, by the very evidence to which he points to assert Ford's alleged knowledge of the defects: the TSB alerts and the 2007 recall.

Unlike RoadSafe, Darne purchased his vehicle after the first TSB alert concerning the 6.5L engine had issued. Those alerts indicate, however, that Ford *did not* conceal or omit information about particular defects, but instead had very intentionally made that information

public. In addition, as this Court previously noted and has Darne has failed to subsequently address, Ford had no duty to disclose information about the alleged defects because Darne and other consumers could have discovered that information by exercising reasonable diligence. The 2007 recall cannot support this claim for the same reason; Ford could not plausibly have *concealed* the alleged defect while at the same time issuing a public recall. In addition, Darne has not added any facts to his most recent complaint regarding any investigative activities he undertook before buying his Ford truck. He has therefore failed to state a claim for violation of the NCUDTPA based on fraudulent concealment.

Darne's NCUDTPA claim also cannot survive based on Darne's allegation that Ford's warranty misrepresented its ability to effectively repair the vehicles. Although Darne now alleges for the first time that he reviewed Ford's warranty before purchasing his truck and that he would not have made that purchase had it not been for the repair representation, Darne still fails to allege any facts indicating that representation was unfair or deceptive. The North Carolina Supreme Court has defined an unfair practice as one that "offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," and further stated that a practice is deceptive where it "has the capacity or tendency to deceive." *Bumpers*, 747 S.E.2d at 228 (quoting *Walker v. Fleetwood Homes of N.C., Inc.*, 653 S.E.2d 393, 399 (N.C. 2007)) (internal quotation marks omitted). Like RoadSafe, Darne has failed to establish that the two under-warranty repairs he alleges Ford performed failed to correct the problems his vehicle experienced. Rather, he alleges that in August 2009, a dealership replaced his vehicle's radiator, and that in March 2010, another dealership replaced the exhaust gas temperature twice. *See* SAC ¶ 17(a)-(b). Darne, like RoadSafe, has not alleged sufficient facts indicating that Ford's repair representation was unfair or deceptive.

Darne's NCUDTPA claim is dismissed with prejudice.

*       *       *

The fundamental problem with the plaintiffs' claims in this case is that they rest on the false premise that Ford represented its 6.4L engines to be defect-free (or substantially so) when in fact Ford expressly disavowed any such promise. What Ford actually promised to do was to fix problems that arose with the engine over the course of its first five years or 100,000 miles. The SAC fails to allege adequately that Ford breached this promise or misled the plaintiffs or other consumers about the possibility of defects in the 6.4L engine and, accordingly, RoadSafe and Darne have once again failed to plausibly allege that Ford is liable for breach of express warranty or for violations of the Illinois or North Carolina statutes. Because the plaintiffs have already had three opportunities to plead their claims adequately, including an opportunity to amend their complaint to address particular deficiencies identified in a dismissal order from this Court, the complaint is dismissed with prejudice. *See Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008) ("a district court may deny a motion to amend if the proposed amendment fails to cure the deficiencies in the original pleading, or could not survive a second motion to dismiss") (quoting *Crestview Vill. Apartments v. United States Dep't of Hous. & Urban Dev.*, 383 F.3d 552, 558 (7th Cir. 2004)) (internal quotation marks omitted).

Date: September 1, 2017

John J. Tharp, Jr.
United States District Judge

27